UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER BRIAN HORTON,
    Petitioner,
        v.
M. ELIOT SPEARMAN,
    Respondent.

Case No. 19-cv-02954-WHO (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Dkt. Nos. 35 and 37

## INTRODUCTION

Petitioner Christopher Brian Horton seeks federal habeas relief from his state convictions for corporal injury to a spouse, spousal rape, forcible oral copulation, and assault with intent to commit a felony. None of his claims has merit. The petition is DENIED.

## BACKGROUND

In 2015, Horton was convicted by a Monterey County Superior Court jury of infliction of corporal injury upon a spouse, spousal rape, forcible oral copulation spousal rape, and assault with intent to commit a felony. Additionally, the jury found true the allegations that Horton had a prior conviction for rape and was a habitual sex offender. A sentence of 156 years was imposed. (Ans., State Appellate Decision, Dkt. No. 22-16 at 122-123.)[1]

The victim of these crimes was Horton's wife, Jane Doe 1 (Jane), who testified at

---

[1] *People v. Horton*, No. H042319, 2017 WL 5167382, at *1 (Cal. Ct. App. Nov. 8, 2017).

trial.[2] She had met Horton in person in August 2010. (*Id.* at 124.) The two talked over the phone a few times after that, and he invited her over to dinner at his house. (*Id.*) During this dinner, Horton told Jane he was married. (*Id.*) She told him she did not want to see him anymore. (*Id.*)

They next met in March 2011 when Horton came to her apartment and told her his wife had died. (*Id.*) The pair began a relationship soon thereafter. (*Id.*) In May 2011, Jane allowed Horton to move in with her, after he told her he "was lonely and that his daughters and mother-in-law had abandoned him." (*Id.*) The relationship became sexual, and in July 2011, Horton asked her to marry him. (*Id.* at 124-125.) She thought marriage inappropriate so soon after his wife's death, and declined. (*Id.* at 125.) They eventually married on November 11, 2011, and had a reception on November 19. (*Id.*)

Horton's behavior and demeanor changed immediately after the wedding reception. He cancelled the couple's honeymoon and scoffed at Jane's invitation to have sex, declaring "it would only happen when he wanted to, not whenever." (*Id.*) In the days after, "he was angry all the time, and would frequently curse, using words like 'fuckin' bitches . . . and putas [Spanish for whores],' words he had not used before they had married." (*Id.*)

Physical and sexual abuse of Jane followed:

> On the evening of November 21, Jane was in the bedroom on the phone with her daughter. [Horton] came in, asked with whom she was speaking, and then ordered Jane to hang up and not to talk to anyone on the phone. Jane continued the call. She then went into the kitchen for a glass of milk. [Horton] came in from the living room and told her she couldn't get anything and ordered her to put down the milk. As Jane returned to the bedroom, [Horton] struck her with 'a very strong blow to the head,' and she dropped the phone. She felt dizzy and '[e]verything went dark.' [Horton] yelled at her, called her puta and said, 'Why didn't you listen to me? I told you to hang up.' After Jane asked why he had struck her, [Horton] kept yelling at her and told her she had to do as he ordered. He shook her by the shoulder. After he stopped, Jane picked up the phone. In response to her daughter

---

[2] Jane, whose first language is Spanish, testified through an interpreter. (Ans., State Appellate Opinion, Dkt. No. 22-16 at 124.)

2

asking what was wrong, Jane said she had just dropped the phone; she was embarrassed to tell her daughter that [Horton] had struck her. After telling [Horton] not to hit her, he said, 'Shut up, whore, puta. You have to do what I say.' She sustained a bump on the back of her head as a result of [Horton]'s striking her. It persisted for approximately one week.

The next evening (November 22), Jane was lying down in the bedroom resting because her head hurt. [Horton] came in, grabbed his penis, and said, 'That's what you wanted.' She told him she didn't feel well and that her head hurt. [Horton] grabbed her by the hair, got on the bed, spread her legs, and orally copulated and digitally penetrated her. Jane, who was crying, told him to stop, that he was hurting her, and her head hurt from him hitting her the previous day. [Horton] turned her, insulted her, called her a whore, and put his penis in her vagina, pulling her hair and slapping her in the face while doing so. He also grabbed her by the neck and spat on her. She repeatedly asked him to stop and told him he was hurting her. He stopped after ejaculating inside of her.

On another occasion, [Horton] took Jane's phone and her 'papers' away so that she was unable to communicate with her family in Mexico. She saw her friend, Jasmin, on the street as Jane was walking to buy a phone after [Horton] had taken her phone away from her. [Horton] also forbade Jane from going to school and took her car keys. [Horton] instructed her to stay inside the house and threatened to report her to immigration. She went to school anyway on foot.

On the morning of December 23, as they were getting ready to clean homes, [Horton] was very upset by someone having left a drawing of him outside the door. He swore and said, 'All women are whores.' After Jane asked him to stop, he said, 'You, too, bitch. Shut up.' When they returned home that evening, [Horton] was still upset and was yelling. At approximately 9:00 p.m., while Jane was in the bedroom on the phone with her daughter, [Horton] came in from the living room and asked with whom she was speaking. After she told him, [Horton] got on the bed and began orally copulating her. After she moved him away and told him to stop because she was talking to her daughter, [Horton] said, 'Tell your daughter I licked your pussy.' Jane told her daughter she would call her back and hung up. She then said, 'Brian, don't treat me this way.' [Horton] responded, 'Shut up, whore, bitch. I will do whatever I want to do.'

Approximately one hour later, Jane was talking on the phone with Jasmin. [Horton] came into the bedroom and again asked her with whom she was speaking. After she told him, [Horton] got on the bed and spread Jane's legs. She told him to stop, but he did not, and he orally copulated her. She again asked him to stop. [Horton] instead made 'really ugly sounds' and said, 'Tell

3

Jasmin that I'm licking your pussy.' Jasmin asked Jane what was going on, and she responded that she would call her back. After she hung up, [Horton] kept calling Jane a whore, and said, 'I want to fuck, bitch.' [Horton] laughed and left the room.

Jane then lay on the bed and chatted on Facebook. [Horton] came back and got into bed. Jane showed him a picture of his daughter she had found. (She had conducted the search because [Horton] had told her previously that 'he wanted to look for his daughters, because they didn't want to see him.') [Horton] became very upset and started yelling at her, again calling her a whore. He got out of bed, grabbed Jane by the neck, raised his hand to hit her, and called her a whore. He then pulled her by the arm out of bed and started shaking her. He pushed her into the living room.

Jane watched television ('the Animal Planet channel') in the living room. After a while, [Horton] came out of the bedroom, threw a Bible at her, and told her, 'Whore, read.' She returned it to her bedside table and asked [Horton] not to throw it. In a later encounter, [Horton] came back into the living room, pulled on his penis, and told Jane, 'This is what you wanted.' Jane asked him not to bother her and said she wanted to rest in the living room. [Horton] pulled Jane hard towards him, took off her panties, and again called her a whore and a bitch. He began orally copulating her; she told him to stop, tried to close her legs, and tried to push him away. He used more force to open her legs again twice more. Because he refused to stop, Jane kicked [Horton] in the stomach, and he fell back on the floor. He then got up and grabbed Jane by the hair and hit her in the face. She asked him to stop. He spat in her face and tried to force her to orally copulate him. She turned her face and told him to stop. [Horton] threw Jane on the floor and continued hitting her in the face and stomach, again calling her a bitch and a whore. Jane struck him in the groin, which caused him to stop momentarily. Jane reached for her phone and tried to get up. [Horton] grabbed her hand. Jane said she wanted to go into the bedroom to rest; [Horton] said, 'No, bitch. You're going to call the police.' Jane went into the bathroom, locked the door, and dialed 911. [Horton] knocked on the door and asked her to open it; she refused. He begged her not to call the police.

Jane told the 911 operator that her husband had struck her in the face and she felt embarrassed. After a Spanish interpreter was brought into the conversation, Jane repeated that her husband had struck her in the face, and that he had grabbed her by the neck and pulled her hair. She said that '[he] wanted to abuse with me [*sic*].'

Two or three police officers responded to the apartment. After being interviewed by them, Jane went to Natividad Medical Center (Natividad). She had significant pain in her left eye that was very light-sensitive. Both

4

sides of her face were swollen, and she had pain in her stomach. She went for a follow-up visit because of her injured eye.

(*Id.* at 125-128.)

Horton's attempts to overturn his convictions in state court were unsuccessful. (Pet., Dkt. No. 1 at 3-4.) This federal habeas petition followed.

As grounds for federal habeas relief, Horton claims: (i) the trial court erred by denying his request for self-representation in violation of *Faretta v. California*, 429 U.S. 806 (1975); (ii) the trial court erred in admitting sexual propensity evidence; (iii) the trial court violated Horton's right to confrontation and due process by stopping the cross-examination of Jane; (iv) the trial court erred by preventing discovery of Jane's prior report of rape and employment records; (v) trial counsel was ineffective for failing to impeach Jane and her friend with the friend's prior inconsistent statements; (vi) trial counsel was ineffective for failing to object to evidence that Horton had stalked and harassed Jane Doe 2; and (vii) the cumulative error of all these claims violated his rights.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of

5

materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

**DISCUSSION**

**i.     Right to Self-Representation**

Horton claims that the trial court unconstitutionally denied his right to self-representation. (Pet., Dkt. No. 1 at 5.)   The relevant facts are as follows.  Horton brought 10 motions to change counsel during the three years preceding trial, from 2012 to 2015. (Ans., State Appellate Opinion, Dkt. No. 22-16 at 140.) In 2015, after the court denied another motion to change counsel, Horton asked to represent himself. (*Id.* at 141.) The trial court advised Horton that he should consider the matter carefully, gave him a questionnaire and a waiver advisement to review and complete, and scheduled a *Faretta* hearing in two weeks on the request. (*Id.* at 141-142.) "In doing so, the court stated that it was giving [Horton] 'two weeks to think about this.'" (*Id.* at 142.)

At the January 2015 *Faretta* hearing, Horton gave the court the signed waiver form (with advisements) and a waiver of the right to counsel. (*Id.*) The form stated that "no continuance will be allowed without a showing of good cause, and that such request made just before trial will most likely be denied." (*Id.*) Yet Horton said at least seven times at the hearing that he would not be ready by the trial date of March 9, 2015. (*Id.*) He cited his need to obtain his files from his attorney, determine what his attorneys had done up to

6

1  that point, meet with an investigator one of his prior attorneys had consulted, and prepare
2  for trial. (*Id.*) He also stated that he did not have the right glasses for reading, there was
3  no law library he could use, and he did not think he would have adequate funds for
4  investigations. (*Id.*)

5        The *Faretta* motion was denied. (*Id.*) The trial court said that it would not grant
6  the request unless Horton was ready to go to trial on March 9. (*Id.*) "We have had this
7  matter set for trial for quite a significant period of time. [¶] And your request to represent
8  yourself at this point is one where you are saying that it would require you to delay this
9  trial. And that is not something that the court or the cases allow." (*Id.*) While
10  acknowledging Horton had a right to represent himself, the trial judge said that "that right
11  has to be weighed against other . . . things that relate to the process and to the
12  proceedings." (*Id.* at 143.) If Horton had made the motion and "had stuck by this motion
13  several months ago, prior to us setting this trial date, we would be in a completely different
14  situation than we are today." (*Id.*) The trial judge brought up the no continuance language
15  in the signed waiver and stated "serving as your own attorney is not good cause" to grant a
16  continuance. (*Id.*)

17        Furthermore, the trial court was concerned that "you are making this at a late date
18  . . . And honestly, my other concern is that you are intending to use this to delay this trial
19  unnecessarily. That you are using this to manipulate the process of the court." (*Id.*) The
20  court concluded: "So based on that [Horton's statement he is not prepared to proceed to
21  trial on the date set], if you cannot move forward at that time in representing yourself, then
22  the court will respectfully deny your request to represent yourself." (*Id.*)

23        The state appellate court rejected Horton's *Faretta* claim. "[T]here was ample
24  evidence from which the trial court reasonably concluded that [Horton] made the *Faretta*
25  request for purposes of delay and to obstruct proceedings." (*Id.* at 147.) The appellate
26  court noted: proceedings had been pending for over three years; Horton's "dissatisfaction"
27  with the attorneys assigned to him; his "repetitive and numerous" motions to change
28  counsel; his failure to make an earlier *Faretta* request; and his repeated assertions that he

could not be ready for the trial date. (*Id.*)

The appellate court emphasized that given Horton's "constant dissatisfaction with appointed counsel, [Horton] could have made a request to represent himself long before he did so on January 8, 2015." (*Id.* at 148.) Also, the record indicated that he "contemplated making a *Faretta* request long before he actually did so." (*Id.*) Horton admitted at the *Faretta* hearing that in August 2014, he told another attorney from the Alternate Defender's Office that because he was dissatisfied with his current attorney, he "was strongly considering taking [his] own case." (*Id.*)

The appellate court underscored that Horton repeatedly said he would not be ready for trial by March 9. (*Id.*) The trial court asked Horton many times about his readiness and repeated that "if his *Faretta* request was tied to the expectation of a trial continuance, the request would be denied." (*Id.*) "And although [Horton] was given ample opportunity at the hearing, he failed to give any indication as to when, if not on March 9, 2015, he would in fact be ready for trial as a self-represented defendant." (*Id.*)

"A criminal defendant has a Sixth Amendment right to self-representation at trial. *Faretta v. California*, 422 U.S. 806, 832 (1975). The right is not absolute, however. *Indiana v. Edwards*, 554 U.S. 164, 171 (2008). The request for self-representation must be "unequivocal, timely, and not for purposes of delay." *Stenson v. Lambert*, 504 F.3d 873, 882 (9th Cir. 2007). A request to represent oneself "need not be granted if it is intended merely as a tactic for delay." *United States v. Flewitt*, 874 F.2d 873, 674 (9th Cir. 1989). "A court may consider events preceding a motion for self-representation to determine whether the request is made in good faith or merely for delay." *United States v. George*, 56 F.3d 1078, 1084 (9th Cir. 1995). In *George*, the court held the trial court's "findings provide[d] ample basis for its conclusion that [the defendant's] motion was made for purposes of delay. *George*, 56 F.3d at 1084.

Habeas relief is not warranted on this claim because the state court reasonably determined that Horton's request for self-representation was a tactic for delay. First, his constant and obvious dissatisfaction with his appointed attorneys (resulting in 10 motions

1  to change counsel) shows that he could have made a *Faretta* request far earlier than he did.
2  Second, although the waiver he signed stated that a continuance was unlikely to be
3  granted, Horton admitted he would not be ready for trial on March 9 and he gave no
4  indication about when he would be ready.  Third, the frequent motions to change counsel
5  indicate that Horton was attempting to delay the trial.  Horton filed his *Faretta* motion
6  after the trial court had denied his fourth motion to change one attorney (Rutledge), his
7  third motion to change another (Liner) and another regarding another attorney (Lambros),
8  which was granted.  (Ans., Clerk's Transcript, Dkt. No. 22-3 at 123-124, 131, 133, 144,
9  257, 286, 296; Dkt. No. 22-4 at 102, 104.)  At the January 2015 *Faretta* hearing, the trial
10 court, after hearing from Horton, determined that petitioner was "intending to use this
11 [*Faretta* request] to delay this trial unnecessarily" and was using it to "manipulate the
12 process of the court."  (*Id.*, Dkt. No. 22-9 at 76.)  On this record, the state court's rejection
13 of Horton's *Faretta* claim was reasonable and is entitled to AEDPA deference.  This claim
14 is DENIED.

### ii.   Admission of Propensity Evidence

Horton claims that the trial court violated his due process right to a fair trial by admitting evidence of uncharged sex crimes against Jane Doe 2 and evidence of sex crimes he was convicted of committing against Jane Doe 3.  (Pet., Dkt. No. 1 at 5.)  At trial, Jane Doe 2 testified that in 1993 Horton raped her after she came to his house for dinner at his invitation.  (Ans., State Appellate Opinion, Dkt. No. 22-16 at 133-134.)  Jane Doe 3 testified at trial that in 1996 Horton raped her after accepting his invitation to help him clean houses.  (*Id.* at 134-135.)

Horton's due process claim was rejected on appeal.  The appellate court concluded the evidence had been properly admitted under state law and did not create prejudice. (Ans., State Appellate Opinion, Dkt. No. 22-16 at 152-159.)

Horton's claim cannot succeed because no remediable constitutional violation occurred.  The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process.  *Estelle v. McGuire*, 502 U.S. 62,

67-71 (1991). Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA. *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006). It has noted that courts have "routinely allowed propensity evidence in sex-offense cases, even while disallowing it in other criminal prosecutions." *United States v. LeMay*, 260 F.3d 1018, 1025 (9th Cir. 2001). And the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

In sum, because the Supreme Court expressly has left open this question presented in the petition, Horton cannot show that a clearly established constitutional right was violated when the trial court admitted propensity evidence. The state court's rejection of this claim was reasonable and is entitled to AEDPA deference. This claim is DENIED.

### iii.     Terminating Cross-Examination

Horton claims that the trial court violated his right to confrontation and due process by stopping the cross-examination of Jane regarding the nature of her relationship with Horton. (Pet., Dkt. No. 1 at 5.) The state appellate court summarized the facts:

> The examination related to her ownership of a vehicle and whether she possessed a driver's license during the time she was married. [¶] During cross-examination, Jane was asked about a Jeep Cherokee automobile she referred to in her direct examination. She testified that she 'would drive it.' Defense counsel asked if she owned the vehicle, and, over the People's relevance objection (which the court overruled), Jane responded that it was owned by another person. The court thereafter sustained the People's relevance objections to defense counsel's questions: (1) whether the owner was a person named Rangel; (2) whether it was true that the owner of the vehicle wanted it back at the time she possessed it; and (3) whether she had a driver's license at the time she was driving the vehicle. After Jane's testimony was completed, defense counsel stated for the record that because Jane had testified that [Horton] had taken her documents, 'we felt it was relevant to be able to probe into whether or not she had a California driver's license and that was part of the documentation that [Horton] kept.' Defense counsel did not mention the inquiry as to ownership of the vehicle or whether

10

>the owner had wanted to take back possession of the car. The court responded that it had 'found that going any further into that line of questioning would not be relevant . . . to the issues before the Court and . . . jury.'

(Ans., State Appellate Opinion, Dkt. No. 22-16 at 174.) Horton contends that the cross-examination was in response to Jane's direct testimony that he took her car keys, phone, and papers from her. Examination of this matter was important "to the exploration of the nature of his relationship with Jane before December 23, 2011." (*Id.* at 174.)

This claim was rejected on appeal. First, the state appellate court saw as irrelevant the evidence that Jane did not valid driver's license at the time she was married to Horton, and failed to see how such evidence related to the nature of the pair's relationship. (Ans., State Appellate Opinion, Dkt. No. 22-16 at 175-176.) Furthermore, "the speculative import" that Horton took her car keys because he didn't want her driving without a valid license was refuted by Horton's testimony that he never prevented Jane from having the car keys. (*Id.* at 176.) Also, Jane admitted during her cross-examination by defense counsel that she had told an investigator that Horton kept "[d]ocuments from my country, the counsel matricula and [her] driver's license from that country." (*Id.*) From this testimony, the jury could have inferred that Jane did not have a California's driver's license during her marriage and "therefore [Horton] never kept it from her." (*Id.*)

"[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examinations based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). A court violates the "Confrontation Clause only when it prevents a defendant from examining a particular and relevant topic." *Fenenbock v. Director of Corrections*, 692 F.3d 910, 919 (9th Cir. 2012). A defendant meets his

burden of showing a Confrontation Clause violation by showing that "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility . . . had respondent's counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680; *Slovik v. Yates*, 556 F.3d 747, 753 (9th Cir. 2009). A due process violation occurs only if the excluded evidence had "persuasive assurances of trustworthiness" and was "critical" to the defense. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973.)

Here, the state appellate court reasonably determined that the trial court's limitation of cross-examination did not violate Horton's Confrontation Clause or due process rights. First, the evidence was irrelevant concerning the nature of the relationship between Horton and Jane. Second, Horton's own testimony contradicted his assertion that he took Jane's car keys away from her. Third, Jane's testimony allowed the jury to infer that she never had a California driver's license during her marriage. Fourth, there was no showing that a reasonable jury would have had a "significantly different impression" of Jane's credibility had counsel been allowed to continue his cross-examination. *Van Arsdall*, 475 U.S. at 680. Fifth, there was no showing that the testimony Horton sought was "critical" to the defense. By ending cross-examination on an irrelevant and unimportant topic, the trial court was acting well within its discretion. *Id.* at 679. The state court's rejection of Horton's claims was reasonable and is entitled to AEDPA deference. This claim is DENIED.

**iv.    Denying Discovery of a Police Report and Employment Records**

Horton claims that the trial court violated his due process right to a fair trial and his Confrontation Clause rights by denying disclosure of Jane's prior report of rape (in 2010 by someone other than Horton) in a Salinas Valley police report and her employment records. (Pet., Dkt. No. 1 at 7.) Defense counsel believed that Jane had had disciplinary action taken against her by her employer, and sought evidence to support this. His requests for both sets of records was denied. (Ans., State Appellate Opinion, Dkt. No. 22-16 at 177.)

The trial court reviewed the employment records and found nothing regarding reviews, layoffs, or any other relevant material. (*Id.* at 177-178.) It also reviewed the police report and concluded it was not relevant and that its disclosure was not likely to lead to any relevant evidence. (*Id.*) The appellate court also reviewed the documents and agreed with the trial court that the records contained nothing relevant. (*Id.* at 178.)

The United States Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes." *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (per curiam). "[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to . . . expose [testimonial] infirmities through cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examinations based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679.

Habeas relief is not warranted on this claim. The trial and appellate courts reviewed both sets of records and held that they were not relevant. Such factual determinations are presumed correct. 28 U.S.C. § 2254(e)(1). Horton has not overcome this presumption of correctness and has not shown how his Confrontation Clause or due process rights were violated. And there is no clearly established right to have extrinsic evidence for impeachment purposes in any event. The state court's rejection of these claims was reasonable and is entitled to AEDPA deference. This claim is DENIED.

**v., vi.  Assistance of Counsel**

Horton raises two claims of ineffective assistance of counsel. In the first, he contends defense counsel should have impeached Jane and Jane's friend Jasmin Deanda. In the second, Horton contends counsel should have objected to evidence that Horton had stalked and harassed Jane Doe 2.

In order to prevail on a claim of ineffectiveness of counsel, the petitioner must

13

establish two factors. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *Strickland v. Washington*, 466 U.S. 668, 687-68 (1984), "not whether it deviated from best practices or most common custom," *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 690). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689).

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). The investigation itself must be reasonable for an attorney's tactical decision based on that investigation to be reasonable. *Wiggins v. Smith*, 539 U.S. 510, 523-24 (2003) (tactical decision not to present life history as mitigating evidence in capital sentencing trial unreasonable where counsel failed to follow up on evidence that defendant had a miserable childhood). However, federal courts should not overlook the "wide latitude counsel must have in making tactical decisions"; therefore, there are no "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Cullen v. Pinholster*, 563 U.S. 170, 194-96 (2011) ("'No

14

particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions'") (quoting *Strickland*, 466 U.S. at 688-89).

AEDPA "erects a formidable barrier to federal habeas relief." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013). The barrier is even more formidable when seeking relief on an ineffective assistance claim. The standards created by *Strickland* and § 2254(d) are "highly deferential." *Strickland*, 466 U.S. at 689. When the two apply in tandem, review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### (a)     Impeaching Deanda

Horton claims that his trial counsel rendered ineffective assistance by failing to impeach Jane and her friend Jasmin Deanda with Deanda's prior inconsistent statements. (Pet., Dkt. No. 1 at 7.) The relevant facts, based on the state appellate court's summary, are as follows. Deanda testified at trial that she had been friends with Jane before and after her marriage to Horton. (Ans., State Appellate Opinion, Dkt. No. 22-16 at 129.) One time after the marriage, Deanda saw Jane crying on the sidewalk, and that she was wearing pajama pants and a long coat. (*Id.*) Jane told Deanda that Horton had taken her phone away, and that she was having problems in her marriage. (*Id.* at 129-130.) Jane said that Horton was aggressive when she did not obey him, and that there had been "physical contact." (*Id.*) Another time, when Deanda called Jane, Jane said "in a desperate manner" that she could not talk. (*Id.* at 130.) According to Deanda's testimony, Horton "was trying to perform oral sex on [Jane] . . . he wanted her to tell [Deanda] what he was doing to her." (*Id.*)

However, when Jasmin was interviewed by an investigator from the district attorney's office, Jorge Ramirez, she said that on the day she found Jane crying, Jane had said nothing to her about abuse. (Pet., Petition for Review to State Supreme Court, Dkt.

15

No. 1-2 at 39-41; Dkt. No. 1-3 at 1.) Horton believes that his defense counsel, Richard Rutledge, should have impeached Jane and Jasmin with this evidence. (*Id.*, Dkt. No. 1 at 7.)

Rutledge declined to impeach for several reasons, which he made clear in a declaration.[3] First, examining Ramirez about Jasmin's interview would put before the jury additional evidence of Horton's abuse of Jane. (Ans., Rutledge Decl., Dkt. No. 22-18 at 146.) Second, impeaching Jasmin about exactly when she heard about the abuse would have been pointless. It would not "portray Deanda as a liar or not credible, as I believed the prosecutor would likely argue that Deanda had simply been confused." (*Id.* at 147.) Third, Rutledge had found Ramirez a "difficult and 'slippery' witness to examine." (*Id.*)

The state appellate court found that no prejudice resulted from Jane's statements to Deanda about her marital problems. Jane herself had testified "in detail" that Horton had been "aggressive" and that "there had been physical contact." (Ans., State Appellate Opinion, Dkt. No. 22-16 at 173.) "Moreover, while [Horton] attaches heightened significance to the challenged evidence, we observe that the prosecutor did not even refer to this testimony by Jasmin in her arguments to the jury." (*Id.*)

Habeas relief is not warranted. First, there was no deficient performance: Rutledge made a reasonable tactical decision in declining to impeach Deanda. He thought that: the examination would add evidence to Jane's abuse claims, hurting his client; it would be pointless because the prosecutor would then contend Deanda was confused, rather than a liar; and from Rutledge's experience, Ramirez was a difficult witness to examine. Second,

---

[3] Horton's appellate counsel, Alexis Haller, submitted a declaration in which he recalls his discussion with Rutledge regarding why he did not impeach Deanda with her statements to Ramirez. (Pet., Dkt. No. 1-3 at 31-34.) Horton relies on Haller's declaration to support his claims. However, Haller's declaration does not change my conclusion. First, it is hearsay, and as such cannot be considered. Second, if I could consider it, it adds little. According to Haller's declaration, on one occasion Rutledge "could not recall any tactical or strategic reason for the omission." (*Id.* at 32.) On another occasion, Rutledge thought Ramirez's report left "a lot of gray area," Ramirez was a difficult witness, and it was best not to raise the issue of abuse again. (*Id.*) On another occasion, Rutledge gave the same reasons put forth above; Rutledge also added his theory that Horton had been bad in the past and was now a changed person, and that the documents did not hurt Horton. (*Id.* at 32-33.)

16

there was no prejudice, as the state appellate court concluded: Jane herself had testified to Horton's physical abuse and to his being aggressive. The state court's rejection of these claims was reasonable and is entitled to AEDPA deference. This claim is DENIED.

### (b) Objecting to Evidence of Stalking and Harassment

Horton next contends that defense counsel rendered ineffective assistance when he failed to object to the admission of evidence that Horton had stalked and harassed Jane Doe 2, consequent to which she obtained a restraining order against him. (Pet., Dkt. No. 1 at 7.) At trial, the prosecution presented documentary evidence that supported the restraining order. (Ans., State Appellate Opinion, Dkt. No. 22-16 at 159-160.)

Rutledge declined to object for two reasons, which he made clear in a declaration.[4] He did not believe that the documentary evidence "negatively affected one of our defense theories: that while Horton had committed bad acts in the past, he had taken responsibility for those acts." (Ans., Rutledge Decl., Dkt. No. 22-18 at 147-148.) He thought that this defense theory "made Horton's claim at trial that he did not commit the offenses against Jane Doe One more credible." (*Id.* at 148.) Also, Rutledge "believed the evidence of Horton's harassment of Jane Doe Two supported the defense position that Jane Doe Two was not raped by Horton." (*Id.*) This is because Jane Doe 2 "did not initially report the rape and only contacted police after Horton began to stalk and harass her." (*Id.*)

The state appellate court rejected the ineffective assistance claim because no prejudice resulted. "[W]hile the harassment/restraining order evidence placed [Horton] in a bad light relative to his alleged actions toward Doe 2, it was far less inflammatory than the properly admitted evidence that [Horton], after befriending Doe 2, gaining her trust, and assuring her that he would respect her desire that they have no physical relationship,

---

[4] Horton's appellate counsel, Alexis Haller, submitted a declaration in which he recalls his discussion with Rutledge regarding why he did not object to the Jane Doe 2 evidence. (Pet., Dkt. No. 1-3 at 31-34.) Horton relies on Haller's declaration to support his claims. However, Haller's declaration does not change my conclusion. First, it is hearsay, and as such cannot be considered. Second, if I could consider it, it adds nothing new. (*Id.* at 32-33.)

17

1 forcibly raped her." (Ans., State Appellate Opinion, Dkt. No. 22-16 at 169.) Also, the documentary evidence was "largely cumulative of Doe 2's testimony (e.g., that [Horton] had raped her)"; "included statements favorable to [Horton]"; the prosecutor "made only minimal reference to harassment/restraining order evidence in her argument to the jury"; and that there were no juror questions "suggested the jury placed any significance" on Horton's stalking of Jane Doe 2, "causing her to obtain a restraining order." Furthermore, Jane Doe 1 presented "strong and direct evidence that [Horton] committed the charged offenses," evidence that was corroborated by others. (*Id.* at 168.)

Habeas relief is not warranted. Rutledge had a reasonable tactical basis for declining to object, so there was no deficient performance. *Richter*, 562 at 105 ("The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.") The state appellate court's determination that there was no prejudice was also reasonable. The evidence was cumulative of and less inflammatory than testimony that had already been introduced. Furthermore, Jane Doe 1 presented strong, corroborated evidence. The state court's rejection of these claims was reasonable and is entitled to AEDPA deference. This claim is DENIED.

**v.     Cumulative Error**

Horton claims there was cumulative error. The state appellate court rejected this claim:

> [Horton] contends further that reversal is required due to cumulative error. We have concluded there is one nonprejudicial error concerning the admission of Jane's statements through the testimony of Jasmin.[5] There are thus no multiple errors to cumulate. In addressing the challenge to admission of the harassment/restraining order evidence, we have assumed without deciding that counsel's performance was deficient in failing to object to this evidence, but have concluded there was no ineffective assistance of counsel that was prejudicial. This assumed error, together with the nonprejudicial error concerning the admission of Jane's statements through Jasmin's

---

[5] On appeal, Horton contended Jasmin Deanda's statements were improperly admitted hearsay, a claim the appellate court rejected and which Horton does not make in his federal habeas petition. (Ans., State Appellate Opinion, Dkt. No. 22-16 at 49-52.)

18

testimony, does not warrant reversal. Considered separately or together, we find 'no serious flaw' in the judgment, and '[o]ur careful review of the record persuades us that the trial was fundamentally fair and its determination reliable.' (*People v. Millwee* (1998) 18 Cal.4th 96, 168.)

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003). Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) (overruled on other grounds).

There has been no showing that the combined effect of alleged errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The state court's rejection of this claim was reasonable and is therefore entitled to AEDPA deference. This claim is DENIED.

## CONCLUSION

The state court's adjudication of Horton's claims did not result in decisions that were contrary to, or involved an unreasonable application of, clearly established federal law, nor did they result in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Horton may seek a certificate of appealability from the Ninth Circuit.

Horton's motions inquiring about the status of his traverse are GRANTED. (Dkt. Nos. 35 and 37.) The traverse is deemed timely filed.

The Clerk shall terminate all pending motions, enter judgment in favor of

respondent, and close the file.

**IT IS SO ORDERED.**

**Dated:** June 14, 2021



WILLIAM H. ORRICK
United States District Judge